I'm here on behalf of defendant appellant Lava Hogan. We have divided up our time, Your Honor, and I got 14 of the minutes. I'd like to reserve two of my minutes for rebuttal. Your Honor, the Supreme Court has recently decided the McFadden case, which makes it very clear that it is reversible error not to correctly instruct the knowledge elements under the Controlled Substance Act. I would like to address the Controlled Substance Act point of our brief first and the knowing misbranding point second. Both of these convictions of my client involve very technical statutes where there is a stated knowledge requirement, and where it is stated McFadden makes plain it must be correctly instructed to a jury or it's reversible error. You have in effect changed the crime. Now the Controlled Substance Animal Hog Act has two knowledge components. First of all, the drug, the substance must be a substantially similar chemical, must have a substantially similar chemical structure to a control substance. Marijuana, heroin, one of the controls. It also must have a similar or greater pharmacological effect to a control substance, or if you represent that it has such a pharmacological effect, that satisfies a second knowledge element. What the court did in this case is in effect what McFadden reversed. While the court below in fact instructed the jury that the government had to prove both that Ms. Hogan and the other defendants knew that the substance was substantially similar in chemical structure to a control substance, and that she knew it had the same or a greater pharmacological effect as a control substance. He then said, however, there is an inference that you can draw even if there is no evidence on the, that Ms. Hogan knew that the chemical structure was similar to a control substance. What the judge told the jury was you may infer from the fact that the defendant knew if the to a control substance, you can infer that they knew it had a chemical structure that was similar. It strikes me that's quite consistent with footnote three in McFadden. Your Honor, I thought so too. And I have to tell you when I first read that footnote, I didn't like it at all. But I asked the court to read it in light of what the court was then discussing. Because what it was then discussing was control substances, not the Control Substance Analog Act. It is clear from the decision that the Control Substance Analog Act discussion and the discussion of the elements and discussion of knowledge starts on the very next page after that footnote, and that that footnote was addressing control substances and what, how you prove those. Well, but there's, I mean, there's more clues than that that Chief Justice Roberts specifically cited Turcotte in his separate opinion. Again, the focus was different, but the inference that the Supreme Court was quite aware of Turcotte and did not intend to overrule it seems rather, not obvious, but a fair inference, let's say. Well, right. That's the second inference in this case I don't like. The first one's the Turcotte inference. And it is a fair inference, except that the Supreme Court didn't have Turcotte in front of it. It wasn't briefed. And Justice Roberts also said something quite intriguing, and that was that it may well be that in a complex regulatory crime like this, the defendant may have to actually know that it's against the law. That may have to be an element. So I think that what he was saying were really more ruminations than holdings. And what Turcotte basically says is, if it quacks like a duck, if you know it quacks like a duck, you can be inferred that you know it is a duck. But the problem is, this isn't ducks. This is highly technical chemistry. And the only witness... But it seems to me, I mean, the point in footnote three was, don't forget, circumstantial evidence may be used here as in many other contexts, particularly when intent is at issue. And the word inference is simply an acknowledgment that we're talking about circumstantial evidence. So why isn't the Turcotte inference, if I can call it that, for shorthand, why isn't that simply circumstantial evidence that McFadden certainly didn't bless, but acknowledged the usefulness of? When you have a known drug like marijuana, that everybody understands what marijuana does pharmacologically, and something comes along and you see people ingesting it and they start acting like marijuana ingesters, it seems fair to allow that inference, although I don't think the court should necessarily single it out, let the government argue that inference. Here, it's not that simple, which is the distinction between footnote three talking about controlled substances and the Controlled Substance Analog Act. These are highly technical. Here is what the government and the court below told the jury they could infer, literally, that Lava Hogan, a store clerk, could know that the naphthol planar indole ring in JWH-018, which is a controlled substance, is substantially similar in chemical structure to the globular round, as opposed to flat, tetramethylcyclopropyl ring. That was the inference. It's not like quacking like a duck, it must be a duck. It's much more complicated than that. The prosecutor below, and I cite this in my brief, in two pages of my brief, the prosecutor below asked the expert that we had called, Professor Greg Dudlett, can you, sir, infer pharmacological effect from chemical structure, or can you infer chemical structure if you know the pharmacological effect? The answer was a resounding no. His expert never agreed. He never even asked his expert that. Having had the only evidence in the record, and the explanation for it, Your Honor, was very simple. This is too complicated to allow the footnote three inference. This is not, we all know what heroin does, we've seen it in the movies, we've all known what marijuana does since Easy Rider came along many years ago. We all see it. It's easy to have that inference, but with this highly technical stuff, as Professor Dudley said, in answer to questions by the government that went unrefuted, this is much too highly technical. It's too complicated. That's why, by the way, Turcotte created the inference. It created the inference to overcome that difficulty, Your Honor, which is not being addressed in footnote three. Why is it more complicated and technical than a drug that's similar to marijuana or heroin? I mean, if you break those down into the chemical formulae, they're certainly going to be technical and complicated, but you seem to be saying if it were similar to marijuana, it's okay, but if it's similar to this analog, then it's not okay to use the inference. Your Honor, I believe that the difference is this. With marijuana, the knowledge of the chemistry is not required. You just have to know it by its generic name. It's marijuana, pot, dope, weed, whatever they call it. That is what the proof element. In this, Congress decided to make the knowledge requirement that you know it is substantially similar in chemical structure. That's why there's a difference. And indeed, Turcotte- I thought we were talking about a drug that's substantially similar to marijuana, not that is marijuana. Well, but that's not the crime. The crime is substantially similar in chemical structure. You have to know the chemical structure, not that it's substantially similar to marijuana. That's the difference, because Congress has made it this way. And the reason, I believe, that one can ask the questions that you're asking, and there's a difference between the two, was highlighted in Turcotte. Turcotte said the Analog Drug Act read awkwardly. It said it is difficult to understand. It's ambiguous. It said it is- it pointed out, actually, the language in Turcotte, Your Honor, was that unlike known drugs, these are newly created substances that people may not know. That's why it said the- and it made that point, Your Honor, and here's what it said. It exalted us to consider Shakespeare. It literally said, therein lies the rub. Those are its words, because of that complication that doesn't arrive with marijuana. And because of that, it said you can infer something because the government needs help with proof. Strikes me we're really talking about congressional intent. How technical did Congress intend the inquiry to be when it used those words in the statute? I think, Your Honor, I think that's right. But they used clear words, and it- that Turcotte was- They certainly didn't contemplate that only organic chemists could violate this law. They didn't, Your Honor, but they worded it the way they worded it, and Turcotte made this very serious observation about the awkwardness of that in 2005. Where's Congress been? Why should the courts have to step in and gloss over something that Congress enacted? The Justice Department is about two blocks away from Capitol Hill. They can walk over there. They do it all the time. They're the ones that got this act passed. They could go back there and get this straightened out. They haven't. Turcotte even called it an interim measure. Well, it's been a decade. Now, I want to switch to something- The allegation were that the drug is substantially similar to marijuana. I thought you were saying earlier that that- then the Turcotte inference would be permissible. The Turcotte inference would be easier to swallow in that circumstance because- Even though we're not talking about marijuana, we're talking about an analog that is substantially similar to marijuana. Well, it's substantially similar to JWH-018. In this case? Yes. I don't understand your distinction between a drug that's substantially similar to marijuana and a drug that's substantially similar to the J formula. You want to try once more on that? The difference is that when the knowledge element is substantially similar to chemical structure, it's one thing to impose an inference where it's marijuana and everybody's seen it on TV. No, this isn't marijuana. It's a drug that's substantially similar to marijuana. All right. If it's substantially similar to marijuana, I respectfully submit that the inference is probably more logical than if it's substantially similar, but inferences don't have to be given in every case. The inference is not grafted into the statute. The inference, Your Honor, is something that the judge does. Maybe you could infer that. Maybe that would be a fair- If this stuff smells like marijuana, you must know it's marijuana. In fact, that's what footnote three is saying, that that's the type of circumstantial evidence. But here, Your Honor, the judge did something below which rendered this worse. He didn't say only if it quacks like a duck, you can infer that they knew it was a duck. He then instructed the jury that it didn't have to find that the substantial similarity in chemical structure was to the same control substance as was the pharmacological effect. He said it doesn't matter if it's substantially similar in chemical structure to heroin, which gives you a downer, and it has the pharmacological effect of a jazzy thing like cocaine. That really renders this as follows. If he thinks it quacks like a duck, you can infer he knows it's a frog. That's what that decoupling does. And that, together with Turka, renders this inference just manifestly unfair. I respectfully submit. I only have a little bit of time. I wanted, unless the court has more questions, I wanted to just very briefly touch upon the knowing misbranding of a drug, which was the other thing that the store clerk was convicted of. Drug, as we have been talking about, marijuana and heroin, that's easy. But drug, under the Food, Drug, and Cosmetic Act, is defined as any substance offered to make any improvement in health whatever. I asked the FDA agent on the stand whether, when my grandmother called me from Connecticut and said, I understand you have a cold, I'm in New Jersey, you may not come up for Easter, have some of my chicken soup, it will get rid of your cold. I asked him if that made chicken soup a drug under the act, and he unreservedly said yes. Now, your honors, for somebody to be convicted of felony fraudulent misbranding of a drug, they certainly have to know that it's a drug in that context. The judge read that out of the case when he instructed that the conviction did not require at all that they knew that this was illegal. Yet, and the jury found her guilty of knowingly misbranding and defrauding the food and drug . . . Well, Hyland says there has to be knowledge of misrepresentations on the labeling. Yes. It doesn't say you have to know the word misbranding, which is a lawyer's term of art or a legislator's term of art, that wasn't that incorporated in instructions? No, your honor, and in fact, and Hyland also says that you have to know that you're violating the law. No, it doesn't say that. Well, your honor . . . Well, intent to defraud, yes, the intent to defraud is knowledge you're violating the law. Right, but intent to defraud, if you don't know it's a drug, if you don't know it's even remotely connected to the Food, Drug, and Cosmetic Act, and where they don't give out notice, they don't have to give out any notice, it's manifestly unfair. Hyland says you have to know it's a drug, and you have to know the FDA hasn't approved it as safe and effective, and you have to know it's, or you either have to know there are misrepresentations or misrepresent it yourself, sufficient to be an intent to defraud. And if you don't know it's a drug . . . The government says the instructions taken as a whole do that. And, your honor, for one to know that something is not yet approved by the FDA, they must have to know that it's something that's under the control of the FDA for approval, i.e. a drug. She had no idea. And that's why they should have instructed the jury that in order to know that you, in order to be convicted of this, you have to know that you're violating the law because it is the law that indicates that this is a drug. It's a very odd definition. How much evidence was there really about what she knew that was going on? She worked there for quite a while, didn't she? She knew what was going on, your honor. I respectfully submit that there was no evidence that she knew that this was a drug. So how could she possibly be defrauding a government agency, i.e. the FDA, if she didn't even know that the FDA cared about it? She certainly couldn't be convicted of defrauding NASA. She didn't know it came under the jurisdiction of NASA. Well, there were frequent . . . I wouldn't say frequent, but every now and then . . . stories about suspects . . . suspicions about what was sold there. Yes. And wouldn't you be aware of that? Your honor, she could be. But that's not what they argued. They argued that she did not have to know that this violated the FDA, that this was under the jurisdiction of the FDA, that it violated the law because the FDA said you had to do certain things because it was a drug. That's the crime they convicted her of. My time is up. Thank you. Mr. Nivald? Good morning. May it please the Court and Counsel, I'm Mark Nivald, representing Appellant James Carlson. The two issues I'm going to talk about are the entrapment by estoppel and also the Daubert issue. I'd like to point out that Co-Appellant Haugen adopts these issues. They apply to her as well. The entrapment by estoppel defense was disallowed by the judge without an adequate basis . . . or despite an adequate basis having been made for presenting that defense. And, on the other hand, the government in the Daubert issue gets to present their witness, Dr. Terrence Booz, who testified on the key issue of the chemical similarity, substantial similarity in chemical structure. So, you've got Carlson, who's denied his defense. You've got the government, who gets to present a witness. I'm unclear because I haven't had time to study the record. But, what happened after the motion in Limoney was denied? What colloquy was there about the entrapment question during the trial? Well, they had a session before the trial started where they kind of went through this at length. And, the defense said, you know, we want to present this evidence. The judges certainly didn't think that Senator Klobuchar should testify. Fine. We're not saying she should have been required to testify. But, the one who should have been allowed to testify and who the defense said during this colloquy was important, the key witness for this was Barbara Carreno, the DEA spokeswoman, who got on the radio and after hearing Ms. . . . I hear you. I didn't hear an answer to my question. I infer the answer is none during the trial. When you get to the end of the trial, the judge asked Mr. Carlson, are you going to testify? And, he says, no, I'm not because you wouldn't let me put on these witnesses. And, he mentioned the DEA . . . he's called her the DEA agent, but he . . . obviously, the only DEA person was Barbara Carreno. He said, you wouldn't let me present her. So, how can I get up here now and just without her testimony . . . When was there a request to present during the defense case? Did the defense counsel, any defense counsel ever say, okay, now we've got the government's case, judge. We told you in the motion in limine, but you weren't satisfied that we need . . . we have an entrapment defense. Here's why we do, with an offer of proof if necessary. Was that done? No, because the court had already ruled that this defense would not be allowed. But, the case is our legion that you don't take a pre-trial motion in limine ruling necessarily as gospel, depending upon what happens at trial. So, okay, now I understand the landscape. Nothing happened at trial that caused the defendants, any of them, to say, now we've got . . . now we've shown you, judge, or the government has shown you, why we've got an entrapment defense. Well, I think it was implicit in what Mr. Carlson . . . Or at least renew the request to call Ms. Carreno. Well, I would ask the court to consider the logistics of this as well. In other words, they've said you don't get to call her. Are they going to fly Ms. Carreno out here and subpoena her and have her sitting there when the judge has already said, no, you don't get to do this? You're saying you had a definitive pre-trial ruling that she could not testify, and so you didn't think you had to renew it? Yes. Well, let me ask you this. Why would her testimony have been relevant? If what's relevant is the defendant's understanding or what he knew from what she said on the radio, what difference would it make what she had to say? Because Carlson gets on the radio, and because of the little bit of time I have left here, I'm not going to go through everything. But the gist of it is Carlson says they've banned five substances now, including JWH-018. Okay, there's at least 210 other substances out there that haven't been scheduled yet. His part of the interview is done. Barbara Carreno gets on by phone. She's on, and she knows that she's been preceded by Carlson because the interviewer basically summarizes what Carlson says and talks about the 210 substances that he says he can keep selling legally. They're still legal, is what he said. And she says, unfortunately, he's correct. So she knew that he was talking about these unscheduled substances and that he felt it was still legal to sell them. And the government says, well, he didn't. That's ambiguous. Unfortunately, it's true. They can keep coming up with people who make this stuff, and they can keep selling it. That doesn't mean we can't prosecute it. And that's exactly what Ms. Carreno should have said. She should have said, well, you know, Mr. Carlson's doing a radio interview. She's not doing a testifying in a courtroom. But she's dealing with his situation specifically. She knows it's Carlson she's speaking to. They don't have to be face-to-face. No case says that. Carlson says there's 210 substances. And she's saying categorically, yeah, he can keep selling those. What she should have said is, you know, Mr. Carlson, under the Analog Act, we can prosecute you if it's already been scheduled, like these five, or we can prosecute you if we can prove that as to these unscheduled substances, they're substantially similar in chemical structure and physiological effect. That's what she should have said. I thought her quote was something like, unfortunately, that's correct. He's correct. He's correct. About what? That he can keep selling the 210 substances and stay one step ahead of the law. That's what you say she meant. But how do we know that's what she meant? Well, in my brief, I have got the news article. It's a news article, though. How do you know that the reporter put together her statement with precisely what you're suggesting she was affirming? It's a news report. Because the news report lays out basically what Carlson says. I know. But I'm just saying, that's how the newspaper article reads. But how do you know that that's actually what she was talking about? It's not a verified complaint or something. We don't have a verbatim recording. That's correct. This is not the High Times reporting this. This is NPR. And when they say this is what Carlson said, and then she's quoted directly after that, as to what he said, she's quoted directly, unfortunately he's correct. And the thing is, let the defense present this. If this is just totally out of context, the government can bring that out at trial. How do we know if there was no offer of proof that Mr. Carlson would have testified if you'd been permitted to call this woman? He said he would have testified. But he was not going to because he. Testified to what? He would have testified that he thought he could legally sell these unscheduled substances. And the judge, he says, I'm not going to testify to that. Well, the colloquy wasn't that specific. But it was implicit that what his testimony would have been was, I had good faith belief that I could continue to sell these. Because of the NPR report? No, because of the pretrial discussion. Here's what our defense is. I mean, his good faith belief, he says he would have said was based on listening to the NPR report? Yes. Now, there were other sources that they relied on, but we're not saying that those should have been allowed in to support it. Like the legislators who have websites and they say this stuff is legal. We're not saying that that should have been allowed in. But Carreno, yes, she's a DEA spokeswoman. This is even better for the defense than a DEA agent just getting up and saying this. She's the spokeswoman. The DEA doesn't put people on the air to talk about things unless they're accurately stating or supposedly accurately stating what the law is. And she's the spokeswoman. If there's anybody in the DEA who's got to be taken at their word, it's Carreno when she says he's correct that he can keep selling this stuff. She's wrong, but that's what entrapment by estoppel is. An official unintentionally but mistakenly leads the defendant into violating the law by telling him or her something that his or her conduct is legal. And it's not what the government says in affirmative misconduct. That's contrary to Railey. Railey v. Ohio accurately states what the law is. How much did she know about the extent of his dealing? I'm sorry, Your Honor. How much did she know about the extent of his dealing, what he was selling? It's pretty clear that when she got on the radio, she had been advised as to what he had said. Because she's responding, unfortunately he's correct. So she knows. You're saying it's pretty clear, but how do we know that? How do we know what she was talking about? Well, the news article is reproduced in my brief. And I agree that is that the most perfect, is that the best way to do it? No, unfortunately not. It probably would have been better to have the recording introduced or bring him in and have a. . . Well, yeah, you'd have to show that when she said, unfortunately that's correct, that whoever was asking the question had laid out everything you're positing. How do we know that? How is the district judge supposed to. . . Well, Your Honor, I'd ask you to read the article. It's reproduced in the brief. And I think it's fair to conclude that they had sufficiently raised that defense, that there was a factual basis for it. And again, all of the government's arguments simply go to the reasonableness of Carlson's belief. If he's got an unreasonable belief, let the jury decide that. That's my point. Carlson gets to present this to the jury. If there's nothing to it, if it's not substantiated, they can convict him. But he didn't even get to go to the jury. It's not the judge who decides this. This is just like the Morrissette case. He's got nothing else to back him up. It's just him. His testimony was . . . . . . and lay it out there and now argue to the judge. With this testimony, we've established enough to bring her in. Well, again, I'd ask the court to consider the . . . Or to bring the reporter in or MPR's CEO, whoever. Well, Your Honor, the judge . . . You can't do it without his testimony, and he didn't testify. Well, Carlson said you didn't let the DEA agent, which he meant by Crano, you didn't let her testify. So I'm not going to get up, because there's nothing to support me. I've got to have that to show my good faith belief. Why didn't he need her? Why didn't he just need the article? Why couldn't he testify and introduce the article as an exhibit and say, I read this on the website and relied on it? Well, I think they'd say it was hearsay. And that's not . . . Well . . . The article is . . . Wait a minute. No, come on. I don't . . . How is the judge going to let him put in a news article and say, that's what I heard and . . . It's enough . . . That's for the defense, not what she would say at the trial. That's after the fact. Yes, but it's . . . It's for the truth of what's in the newspaper. It's admitted for what he thought it . . . Yeah. But the question I'm getting . . . It's not hearsay, period. Well, Your Honor, you're saying that . . . you're indicating that this article was not enough to get the defense in, but then they're supposed to present that at trial? I'm not saying it was enough. I'm saying if it were enough, why wouldn't that be the proper way to present the case, present the defense, rather than calling a witness? It could have been made much clearer if Carreno comes in. But the problem is the judge just wasn't going to allow the defense. The judge knew what the news article was. It was right in the . . . It was used up all the defense time on all issues. So, no, wrap it up. Okay. And on the Dalbert issue, just very briefly. No, we don't need . . . You preserved that with a thorough briefing. But, you know, have they used the entire 30 minutes now? No, Your Honor. They have about two minutes left. Okay. I'm going to let Mr. Hawkins speak. It's on the brief. Thank you. Thank you. Mr. Hawkins? I'm going to be brief and quick. We've outlined this. Mr. Gellarman was convicted of two misdemeanor counts of delivery of misbranded drugs. Our position is, based upon the fact, and I think if you look at these cases, you'll find that it's an unusual way to charge these, to charge aiding and abetting, that he had to know by aiding and abetting that a crime was being committed by Jim Carlson, and that's not present. Assuming that he has to know that, he's not guilty based upon the evidence in this case. If you get past the aiding and abetting, then he has to be convicted as a principal. If you have to be convicted as a principal, then the principles set forth by the United States Supreme Court and Park apply. That means that strict liability can only apply to Mr. Gellarman as if he's in a position of authority because Park pointed out there's a limiting principle that you have to be in a position to be able to change, alter, or do whatever. My client was a clerk. I'd reserve one minute, Your Honor, for rebuttal for Mr. Gellarman and Mr. Nye. Thank you. Thank you. Mr. Sazenema? Saxena, Your Honor, thank you. And may it please the Court and counsel, my name is Surya Saxena. I was the prosecutor below, and I also handled the briefs before this Court. Before jumping into the legal discussion about Turcotte, I did want to also touch on McFadden as Mr. Markham had. In the United States Supreme Court case McFadden, the Court imposed a scienter requirement that is actually lower than the scienter requirement that the district court gave to the jury in this case. The McFadden Court outlines a two-part system, an alternative system for proving scienter in an Analog Act case, and the first method that McFadden lays out for proving scienter was not part of our case, but it would have been helpful certainly if that was the law in our case. That standard is that the defendant is guilty and has the mens rea to commit an Analog Act offense if circumstantial evidence shows that the defendant knew of the regulated status of the drug under the Controlled Substances Act. And footnote one of McFadden lays out many of the same types of circumstantial evidence that we presented in this case. In particular, it lays out that where a defendant knows that they're selling a substance for human consumption and it gets someone high like a controlled substance, that is strong circumstantial evidence that the defendant knows that the substance is regulated under the Analog Act. Similarly, as Judge Lowe... What's your point here though? I thought you said the jury was not instructed on this theory. The jury was not instructed on this theory, Your Honor. But that's your lead argument? Well, my point was going to be, Your Honor, that the standard in our case was higher than McFadden. And so to the extent that there's... It wasn't higher. It's just that you picked one of the two ways and you went with that, right? Correct, Your Honor. And your point is well taken. The second method of proving scienter in McFadden is congruent with Turcotte. It arose out of Turcotte. If you take a look at the briefing in McFadden and Robert's concurrence, it's clear that the Supreme Court, that standard of knowledge that requires knowledge of chemical similarity and knowledge of pharmacological similarity was first outlined in Turcotte, and that's where the Supreme Court is getting that standard. I just wanted to agree with the question from Judge Loken about Footnote 3. Footnote 3, I agree, pretty clearly states that the Supreme Court is adopting the use of circumstantial evidence, such as knowledge that a drug causes a high, circumstantial evidence of the defendant's evasive conduct in selling a controlled substance analog, charging a high price, knowing that search warrants, for example, have been executed on their premises or arrests have been made, knowing about charges in other cases, that that is circumstantial evidence to prove either knowledge of regulated status or that the defendant had facts that would have incentivized them to learn about the chemical name of the compound that they were dealing with and its similarity to a controlled substance. So turning to . . . What about evidence about the way they handled it and kept it and sold it? Absolutely, Your Honor. I think both Turcotte and McFadden focus on all forms of circumstantial evidence, and we had significant circumstantial evidence of the way that the product was dealt with. For example, Fawaz Khanan was a supplier of one brand of the synthetic cannabinoids that they sold at Last Place on Earth. He testified that after Last Place on Earth was searched by state authorities on the first occasion, Mr. Carlson called him and told him to put false names on all of the packages and all of the invoices that Mr. Khanan sent following that to Last Place on Earth. That type of evasive conduct, treating this substance as if it is something that is regulated, is important. And then the more pervasive evidence of that was that all of these products were sold as not for human consumption, and that language is taken directly from the Analog Act. There was an email in Mr. Carlson's email account from another synthetic drug seller which cautioned all of these synthetic drug sellers to make sure they put that on the label. And that is strong evidence that the defendant not only had knowledge of the regulated status under McFadden, but also that they had strong knowledge that it was a substance that had an effect similar to a controlled substance and that the Analog Act applied. Turning to the Turcotte inference... You seem to be saying, well, if you'd had the jury instructed that knowledge of a regulated status was sufficient, then you'd have had a good case. But that isn't how the jury was instructed. So the jury was instructed on knowledge of the chemical similarity, right? Correct, Your Honor. And just to clarify, our position on this appeal is that the Turcotte inference was appropriate in this case, and the district court did not abuse its discretion in giving that inference. But since we didn't have an opportunity to brief McFadden, I just wanted to start there. We're not backing down from the instruction that we promoted to the district court and that the district court gave in this case, and we believe that we proved that standard as the jury confirmed. So what's the basis for the Turcotte inference? The basis for the Turcotte inference, Your Honor, is the Turcotte decision. The Turcotte decision is very clear that that inference, like any permissible inference, is based on the facts of the case at hand. And so while I might concede that there is a hypothetical situation where that Turcotte inference might not make sense, what the district court did in this case, in its discretion, is determine based on the record that it had before the charge conference, right before it instructed the jury, did this inference make sense to give as a permissible and not mandatory inference. All right, so what's the evidentiary basis for the rational connection between the one knowledge and the other in this case? First, in this case, Your Honor, the evidence was that starting in 2010, the defendants admittedly publicly knew that they were selling JWH-18, which is an obscure research chemical that has no purpose outside of a research lab other than as a recreational drug. And then on March 1, 2011, DEA temporarily scheduled JWH-18 as a controlled substance. And on that date, Mr. Carlson made numerous public statements that there were several similar chemicals available. He then started selling the same products in the same bags with the same labeling, but that contained a different chemical. The evidence throughout the trial was that all of the defendants knew the effects. Mr. Carlson would go into the media and say that he was a medicine man and that this product could cure ails in the same way that marijuana is believed to cure certain ailments. Ms. Haugen used the drugs herself and became addicted to them. Ms. Haugen and Mr. Gellerman were repeatedly caught on undercover video and audio at the store talking about these drugs as if they were substitutes for controlled substances. On that record, the district court didn't abuse its discretion in instructing the jury that where a defendant knows that they're selling a product, an obscure research chemical, for human consumption as a substitute for a controlled substance, that they're likely to have also become aware as a result of that business what the chemical similarities of that substance are to the controlled substance, in this case JWH-18. And that's what the Turcotte inference... Well, what about the decoupling of the substances? You just said they're likely to have inferred that this chemical is similar to JWH-18, but the instruction was not that they were likely to make that inference, but that they were likely to infer it was similar to any controlled substance. Yes, the decoupling comes from the legislative history primarily, Your Honor, and the Analog Act... I understand why the decoupling is allowed. I'm asking now about the inference, whether the inference is correct, not whether they have to prove that the drugs are the same, but whether it's permissible to infer from an effect similar to methamphetamine that the drug is similar to marijuana in chemical structure, for example. Yes, Your Honor, I submit that the Turcotte inference works whether there's a decoupling or a coupling of the two factors, and this is why your methamphetamine example is a good one. In fact, we had testimony in this case that these drugs have a methamphetamine-like effect, but their structure is similar to JWH-18. And the reason is this. If you're in the business of selling a research chemical that really has no business being outside of a research lab except as a recreational drug, and you sell it for a high price and it becomes a centerpiece of your business, then what Turcotte is saying is that in those situations, somebody in possession of that type of drug is likely to have also learned by operation of the fact that they've obtained this obscure drug, by the fact that they know what price to sell it for, by the fact that they know which controlled substance, that is, illegal substance that it mimics, that they've also learned what actually isn't that difficult to learn about its chemical similarity to a controlled substance. And in fact, the defendant's own expert, Dr. Dudley, admitted multiple times that the information that's necessary to satisfy knowledge of chemical similarity to a controlled substance isn't really that technical at all. It's widely available on the Internet, and our expert also indicated that anyone in a more legitimate business, for example, that wants to start selling a medication or a drug for human consumption, the first step that most people take when they're selling a drug for human consumption is to check what it is and what its regulatory status is. And our expert, Dr. Bose, indicated that that's not done in these cases. It could have easily been done, but it's not done in these cases because analog act defendants are trying to conceal what they know about chemical structure, what they know about the chemical name of the substance that they're using. And so when Jim Carlson and the co-defendants make a very open switch of chemicals from JWH-18 to AM-2201 and they know the effects of it are like a controlled substance, that knowledge creates the incentive for them to know or learn more aptly that the substance is a chemical, AM-2201, UR-144, XLR-11. They want to know that it's not the same as the thing that it was before. And in the process of getting that knowledge, I believe the defense expert established that they would have learned what is required in terms of chemical structure. I think another point in that regard, Your Honor, is that this Court has had multiple prior Analog Act cases, and it's never required, either pre-Turcotte or post-Turcotte, the kind of detailed knowledge of chemical structure that I think Mr. Markham was advocating is required under the statute. The requirement isn't that the defendant must be able to sit on the witness stand and draw the chemical structure. That's not what's required. The knowledge requirement is that the defendant must know the similarity to a controlled substance. And I would submit that a defendant can know, a lay person can know, that something has a chemical structure, whatever that is, and it's similar to the chemical structure of a controlled substance. For many years there's been a lot of publicity about this place and suspicions, apparently, that law enforcement had that have been reported. How important was it in the end to have this inside informant or somebody that cooperated? How important was it in the end to have Mr. Anderson testify? Mr. Anderson's testimony, I would submit, was important. What Mr. Anderson established was that Mr. Carlson, when he first obtained these synthetic cannabinoids from a supplier, had Mr. Anderson and others ingest the substances in the Last Place on Earth store so that Mr. Carlson could learn the effects. He told Mr. Anderson and other employees how to market the substances to customers, for example, what dosage, how to administer the drugs by putting them into a one-hitter, which is a pipe that's used often to smoke marijuana, to use it sparingly because he knew that there were potential health effects, that these were very potent drugs. So Mr. Anderson's testimony established that Mr. Carlson knew not only everything that he needed to know about the effects of the drug but also everything that he needed to know about structure. So even if the court were to find that the standard of the Turcotte inference was error, the government would submit that there's harmless error beyond a reasonable doubt. In addition to Mr. Anderson's testimony, there was a significant amount of testimony about what Mr. Carlson knew about the chemical structure and similarities between JWH-18 and the other analogs that he ultimately ended up selling. He would discuss the chemical names with his suppliers. He had e-mail correspondence from suppliers which specifically identified the chemical names. Even on one occasion, he received an e-mail from a group of other synthetic drug distributors that had an Excel spreadsheet attached which lists the molecular number for some of the analog substances that he was selling and compared them to JWH-18. He made public statements indicating that the analogs he was selling, he only needed to change one molecule, and then the government's got to start all over again and can't prosecute him for his offenses. So although he clearly made a mistake of law about what he was doing, there was no lack of knowledge of chemical structure on his part. What about Haugen? And I was just going to get to Ms. Haugen, Your Honor, and candidly there's less direct evidence of her knowledge of the chemical structure. However, viewing the evidence in the light most favorable to the verdict, there was a significant amount of evidence that she also learned the chemical similarity of the substances. First, as in any conspiracy where the defendants have a close relationship, they're involved in the same scheme or plan, the jury is entitled to infer that the conspirators spoke to each other. And in this case, perhaps more than the normal controlled substance trafficking case, Mr. Carlson was making repeated public pronouncements. He went to a city council meeting. He did a number of television interviews, many of which were at the store. There was one television interview where he was interviewed and then Mr. Anderson was smoking the substance right outside the store. Ms. Haugen wasn't just a clerk. Ms. Haugen was responsible for ordering these substances from the suppliers. There's e-mails where she used Mr. Carlson's own e-mail account to communicate with synthetic drug suppliers when he was either on vacation or otherwise unable to do it. And importantly, there was testimony from Sherry Anderson, who was also an employee at the store, that indicated that when an employee did inventory of their existing stock of synthetic drugs, they would prepare an order form and then sit or stand with Mr. Carlson as he called the supplier. And in our appendix at page 101, 102, we've reproduced those exhibits. And what those are are order forms where Ms. Haugen had initialed the order form as preparing it and then Mr. Carlson would go and write notes when he ordered the drugs. And on one of those forms, he wrote AMFED plus MD in his writing right over the order that she was making. And that drug, which would prove to trial, that they were ordering, Rolex, contained 4-FA, 4-fluoramphetamine. It differs from amphetamine by only one atom. So it's pretty clear the inference from that was they were ordering a drug that they wanted to mimic amphetamine, and it's written right next to the drug that does that. So she wasn't just a clerk that stood at the counter and sold the stuff. Additionally, she used it. There was a significant amount of evidence that she was using the drug herself. She wanted a marijuana substitute. She became addicted to the drug. All of these would support an inference that she, along the course of this long-term conspiracy, large-scale conspiracy, she learned what the names of the drugs were and had sufficient information to research them. Additionally, there was Internet search history on the store's computer, which indicated that someone, likely Mr. Carlson, but anyone who used the computer, actually went to websites and looked up information about JWH-18. Additionally, Your Honor, there was a deliberate ignorance or willful blindness instruction given, so we would also rely on that if the court determined that the Turcotte inference doesn't apply or that there was error in giving that inference. But so just to come back, before I move on off of the Turcotte issue, Judge Colleton, to your question about the decoupling of the prong one and the prong two and three, I don't think the defendants are arguing that there's any problem with that decoupling on the issue of proving that something is, as a matter of fact, a controlled substance analog. I think their argument is that that doesn't work well with the Turcotte inference. And my response to that, and my response... The knowledge inference, they're saying, doesn't follow. That if you know something has an effect like methamphetamine, that it might be reasonable to infer that you know that the drug is similar to methamphetamine. But when the drug is actually not similar to methamphetamine, it's similar to some other drug, why would you infer one knowledge from the other? I think that's the question. And I think my initial response was that if the defendant knows that something has a controlled substance-like effect, and that means that the defendant knows that they're selling something for human consumption that mimics the effect of something that they know is illegal, like methamphetamine. They know they're selling a substitute for methamphetamine. And they know what price to sell it for, etc. They're selling it as part of their business, not for research. Then that fact gives the person such an incentive that it's reasonable to assume, in most cases, and certainly on the facts that were presented in this case, that the defendant also learned in acquiring that drug, in determining whether they were actually going to endeavor to engage in this conduct, that they learned the name of it and that they learned that it was a chemical analog of a different substance. And that's important because many controlled substances have widely varying effects. They may have an effect like cocaine and marijuana, and some of these drugs actually do. Some people would describe the effects of these drugs as calming, depending on the dosage, and then if they used too much, they would amp somebody up and they would get an effect like methamphetamine. It's also very important for prong three, which I think oftentimes takes a back seat to prong two of the analog definition. Prong three relates to represented and intended effects. And this is what Congress was really focused on when it passed the Analog Act, because they had a group of people in California selling fentanyl analogs, and they would say this is like heroin. Well, it was like heroin in effect. You're never going to get to the issues I wanted to hear about. Start with Hyland. I think your brief misreads Hyland, and so where is it in the instructions that I will find adequate coverage of the three knowledge prongs that Hyland requires? Knowledge of drug, knowledge not safe and effective, and knowledge of labeling misrepresentation. Your Honor, there was two instructions. First, I think perhaps what you're looking for is instruction number 38, and that is the instruction that pertains to the specific intent to defraud or mislead a federal government agency. And so you're correct, Your Honor, that there are multiple requirements in Hyland. One of them is the specific intent to defraud or mislead a government agency, and those are laid out by name in instruction number 38. So the jury was instructed that any misbranding count required the defendant to know that the substance was regulated in some way, not a specific way as laid out in the misbranding statute, but in some way by a specific federal government agency, and those were laid out, DEA, FDA, Customs and Border Protection. And then in each one of the misbranding instructions itself, the court also required, and this is contrary to what Mr. Markham told you, the instruction specifically required the defendants to know that the substance was misbranded as a matter of fact, not as a matter of law. And misbranded means that the labeling or the marketing materials or the oral representations surrounding the sale of the drugs was misleading, either contained a specific misstatement or a misleading omission. Was the word misbranded used in the instructions? In every one. Undefined or defined as you just defined it? Misbranded was defined as either something that contains a misleading statement or omission, or that fails to identify the distributor or the packer of the drug, or that fails to provide adequate warnings where the use of the drug might be dangerous. It listed the same things that were listed in the indictment, which come from the statute. But that's as a matter of fact, not as a matter of law, and Highland is very clear that they shot down the defendants who were making the same argument in Highland that they needed to somehow have knowledge of the specific misbranding provisions and be able to do that. Have I answered your question? I'd like to turn briefly to the... The other one that bothers me is the 1 to 167. Where in the guidelines is that? Your Honor... I look at that Note 8, the 2D1.1, and I don't see... I'm not enough of a drug... I don't know enough about drug chemistry to be able to find the 167, which your brief represents as a guidelines determination. Yes, Your Honor, and if you take a look at Application Note 6 in 2D1.1, what Application Note 6... It doesn't have any numbers in it. There are drug equivalency tables, Your Honor, that are cross-referenced in Application Note 6, and they appear in that same long section. And I apologize, I don't have my guidelines book here. But as you keep flipping through... But they're not in 6. I think that's correct, Your Honor. There's a whole bunch of tables in 8 that go on for pages and pages, and THC is not there by name, and the only reference where I see a 1.67 is for 2,5-dimethoxy-4-methamphetamine-DOM. That's not THC. Where is it? It is there, Your Honor, and I'd be happy to... I'd have to actually look at the book to point it out to you, but I believe it's used as its longer name, tetramethyl... And it is there as synthetic or organic. And where do I go to find the legal wisdom of this equation, which strikes me as pretty preposterous? Your Honor, and I'm not going to argue with you that there may not be a lot of legal wisdom behind the 1.67 ratio itself, and it's not... We're past the mandatory guidelines, which is the way you argue it in your brief. Where... THC is the active... That's what gets you high from marijuana, right? Correct. And 1.67, apparently the expert testified, is the amount of THC that's in hemp and rope. Your Honor, as I understand... You know, that's ditch weed. So it bears no relationship to getting high. So, all right, if you can't tell me where the source is, tell me what the impact was on the sentence. Your Honor, it's not clear what the impact was on the sentence. I think what the defendants are arguing is that the court made a guidelines application error. You mean a procedural error in calculating the advisory guideline level? Correct. And the government is not contesting that the court could have considered Dr. Cozy's testimony under 3553A. What the government's position is is that the defendants were inviting the district court to commit error by applying a ratio that isn't listed in the guidelines. The court first has to determine the guidelines correctly, and then it can vary or depart upwards. So they argued for... Did they argue for a variance on the grounds that they thought this ratio was unsupported or excessive? Did they argue for a variance on that ground? The defendants argued for a variance, and the government also argued for a downward variance. We argued for a downward variance. And remind me, what did the judge do? The judge sentenced Mr. Carlson to 17 and a half years. I mean, what did he do on the variance question? The court did grant a downward variance, and one of the stated reasons for the downward variance was some concern about the ratio that's listed in the guidelines, although there wasn't a long colloquy from the district court about what that concern was. Very downward as to both him and Haugen? Yes. Both Carlson and Haugen received significant downward variances, and that was one of the stated reasons for that. Are you referring, when you say it's in the table, in Note 8, under Schedule I Marijuana, it says 1 gram of tetrahydrocannabinol organic equals 167 gram of marijuana. Is that what you're saying is the applicable cross-reference here? That's correct, Your Honor. Thank you for finding that out. Well, there's one that's organic and one that's synthetic. And they're both the same ratio, Your Honor. Right. But what are we dealing with here, the synthetic or different? Correct. So the application Note 6 requires the court to take a look at whether there is a substantially similar chemical structure, and here there isn't, to a substance that's listed in the guidelines, and then effect and potency. And none of the substances that are listed in that Note 8 are similar in structure to JWH-18 or to AM-221 or these others. But the court did say that the effect, and our experts said that the effect and the potency are most similar to THC. And so the guidelines say any time there's a substance, whether it's an analog or a listed controlled substance, and there are many listed controlled substances that aren't listed in the guidelines. So we can have many cases where we have to do this marijuana conversion. And this is the ratio that is used for anything that's most similar to THC. And then the court has to apply its good judgment in deciding, well, is that really fair? Does the Sentencing Commission have this right? We're talking procedural error now. What case has marched through this exercise from the standpoint of what constitutes procedural error? What case has cited? Well, you just explained the process, as I thought, that this is not science. This is not going to the guidelines and reading 5H1.11 and say, oh, that applies. So how do we gauge whether there's procedural error in using that ratio for this offense? Well, it would be procedural error if the court made the findings that this was most closely related to THC, which it did, and then didn't apply the same ratio in the guidelines. The finding itself could be procedural error. The finding of it being a different ratio would be procedural error in our view. Oh, no, the question whether the finding was accurate here that it was most similar to THC. Is that supported by the record? Yes, it was, Your Honor. We had a pharmacologist testify that each of these substances in numerous lab rat studies has been found to be most closely related to THC and also in potency, and the defendants didn't present any counter evidence, not that they have to. It is also not my understanding that the defendants even argued that the court was wrong in finding it was most closely similar to THC. In fact, their whole argument is that, yes, it's most closely similar to THC, but the concentration of THC in marijuana is so low that the court should have used a different ratio. Not that it's not most similar, but that they used the wrong ratio, and there's only one ratio that can be used. That's the government's argument. So the defendants haven't preserved or argued that this isn't similar to THC. I see that my time is running out. If there's any other issues the court would like me to address, I will. Otherwise, thank you. Very good. Does counsel have time? Forty-nine seconds, Your Honor. Two minutes. Thank you, Your Honor. Mr. Saxena got up and, I thought, gave a very compelling argument about all of the supposed circumstantial evidence from which one could infer that Lava Hogan or the other defendants may have known of the chemical structure. We disagreed with his version of those events, but the point is that in a trial the fair thing to do is to let both sides argue what that evidence means, that circumstantial evidence, not to superimpose the Turcotte instruction on top of it. If he had all that evidence, he didn't need the Turcotte instruction, and that's our point, he needed it, because it is not the way he said it, if one reads the record carefully. For one thing, concealment. If this guy, Mr. Carlson, was out on radio saying what he was doing, the testimony was that there were people lining up outside of his door, his door, his store, taking these products and then going out on the street and throwing up. The local businessmen were complaining. If that's invasive conduct, it's like a duck being a frog. It simply was not invasive. We could have made good arguments to that effect, but what the judge did was he took all of that out of it, by giving the Turcotte instruction for the reasons that Turcotte said, because this is a difficult thing to prove. It would have been a much more fair fight without the Turcotte instruction, and they've had 10 years to change this. Now, the second thing that I want to address here is that in answer to Mr. Saxena's questions, which were not asked of his own expert, Mr. Saxena, the prosecutor, but which were asked of our expert, our expert said, you cannot predict pharmacology from substance. The unpredictable nature of pharmacology means you cannot look at one and determine the other. That's the factual record in the case, Your Honor, and I respectfully ask this Court to read Hilland for the purposes of the jury instruction it approved, which had the requirement that you know that you're violating the law. Who knows what a drug is under this broad term unless they've read the act. Thank you. Very good. Thank you, Counsel. The case has been thoroughly briefed and argued. It's got a lot of issues. It's been well presented. We'll take all three cases under advisement.